# UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI
(Kansas City Docket)

**UNITED STATES OF AMERICA,**

    PLAINTIFF,

vs.                                                 CASE NO. 19-00031-07-CR-BCW

**CRYSTAL CANDELA,**

    DEFENDANT.

## MOTION TO SUPRESS

Crystal Candela, by and through counsel, Thomas H. Johnson of Petefish, Immel, Hird, Johnson, Leibold & Sloan, L.L.P., moves the court for an order suppressing her statements taken by the police in a custodial interrogation conducted in a police car on December 14, 2017, in Denver, Colorado, and subsequently in a follow-up telephone call on December 16, 2017, and a meeting on December 28, 2017, without advising her of her Miranda rights, knowing that their questioning was designed to elicit incriminating statements from her.

1

# MEMORANDUM

## I.  Statement of Facts.

Ms. Candela was indicted on January 25, 2019, along with six other co-defendants, in a two-count indictment for conspiracy to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and § 846, and conspiracy to commit money laundering, in violation of 18 U.S.C. 1956(a)(1)(A)(i), (B)(i), (ii) and (h). The Indictment also contains an allegation of forfeiture and a money judgment against defendants if convicted of counts 1 and 2 in the amount of $1,855,000.00 based on the alleged unlawful distribution of more than 75 kilos of methamphetamine at an average price of $700.00 an ounce and laundering the proceeds of the drug sales. The government seeks forfeiture of any property in defendants' possession up to the amount of the money judgment including substitute assets.

On June 4, 2019, the government filed a Superseding Indictment alleging the same two counts as the original Indictment, including the forfeiture allegation, the money judgment and the ability to seize substitute assets to satisfy the money judgment, and adding four more counts, none of which are against Ms. Candela. The charges against Ms. Candela in the Superseding Indictment are the same as in the Indictment.

The government's interrogation of Ms. Candela

The government alleges that Ms. Candela transported drugs from California to Kansas City, Missouri and Columbus, Ohio for the drug trafficking organization.

On December 14, 2017, early in the morning, Ms. Candela, driving her mother's truck, stopped at the public library to drop off some books. She pulled into the drop-off area in front of the library, got out and took the books to the after-hours drop-off box and returned to her truck. As she was leaving, officers pulled up next to her in an unmarked car and cut off her exit, blocking her ability to leave. This frightened her. Officer Daneff got out of the car, approached her truck, knocked on the window and told her to get out of her vehicle and into the officers' car. He escorted her to the police car and put her in the front passenger seat (Officer McCormick was in the driver's seat) and closed the door behind her. He then got into Ms. Candela's truck and moved it from the front of the library to a longer-term parking space. He then returned to the police vehicle and got in the back seat behind Ms. Candela. Ms. Candela felt as if she were under arrest. She wasn't told that, but the officer's actions implied as much and that's what it felt like to her and would to any reasonable person. She felt, just as any other person would have, that she had no choice. Officer McCormick then began to question her and pressure her to talk, telling her she knew what was going on and that Crystal would be better off if she told them what she knew. The agents

3

interrogated her about people in the drug trafficking organization and about the gray Toyota Camry registered in her name; she answered the officers' questions. Agent McCormick wanted Ms. Candela to work for them. At no time during the interrogation was she provided her *Miranda* warnings; nor was she told that she was free to leave and under no obligation to answer their questions. Ms. Candela never agreed to work for the police.

The officers knew that Ms. Candela was somehow involved in the crimes they were investigating. They interrogated her knowing their questions were likely to elicit incriminating responses. Specifically, the officers asked about the gray Camry registered in her name. They suspected the vehicle was used to transport drugs. Ms. Candela told the agents she did not know what was in the car, but that she had made several trips to Kansas City, Missouri and Columbus, Ohio. She was introduced to a person in California by a man she knew in the Denver area named "Lalo." She estimated that she made several trips to Columbus, Ohio and two times she came to Kansas City, Missouri. She would drop the car off where she was told, stay in a hotel, and then return in the car after it was redelivered to her at the hotel where she was staying. At the end of this interrogation, Ms. Candela was told by Agent McCormick to call her later that morning because she wanted her to talk to another agent so that he could follow up with her.

4

Ms. Candela did not call Agent McCormick later that morning, and Agent McCormick called her many times over the next day, leaving messages for her to follow up. Ms. Candela was concerned about her repeated calling. Finally on December 16, 2017, she returned Agent McCormick's call. Agent McCormick continued the interrogation, again without advising her of her right not to speak with her or to answer questions. Ms. Candela felt she had no choice but to continue answering Agent McCormick's follow-up questions about the same thing she had been interrogated on the morning of December 14, 2017, in the Agent's car. She responded consistent with her first statements. Lalo "recruited" her and registered the car in her name and paid all the registration fees. Two weeks after the car was registered, she saw it for the first time. Lalo then came and took it twice, saying it needed further repairs. Within a couple of months after receiving the car, Lalo told her to drive to Corona, California. He gave her $300 gas money. Once she got there, she was to call him and he would tell her where to go. A person she did not know contacted her and came to the hotel where she was staying, they met and he picked up the car. Later he returned it to her and would then tell her where to take it and give her expense money.

Finally, on December 28, 2017, the person Officer McCormick wanted Ms. Candela to speak with called her and told her to meet him at a Panda Express in Aurora, Colorado, which she did. At that meeting,

5

again without providing her the *Miranda* advisements, she was asked to identify a series of photographs, which she did.

The police interviews were not voluntary. She was not free to resist; she felt she had no choice but to answer the officers' questions from the first time on December 14th through the last meeting on December 28th. There were always multiple officers present. She was never advised that she had any alternative other than to do what they said and answer their questions. None of the interviews were recorded.

## II.     Argument and authorities.

The *Miranda* warnings are required anytime there is a custodial interrogation. For an interrogation to be custodial, a suspect must both be in custody and interrogated. *United States v. Hatten*, 68 F.3d 257, 261 8th Cir. 1995).  The *Miranda* court clarified: "By custodial interrogation, we mean questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 444, 444, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).   Any statements made under questioning under these type of circumstances and without having been specifically advised of the procedural safeguards provided for in the *Miranda* warnings is inadmissible. *Id.*

Interrogation is direct questioning by law enforcement reasonably likely to elicit an incriminating response. *Rhode Island v. Innis* 446 U.S. 291, 301, 100 S. Ct. 1682, 1690, 64 L.E.d2d 297 (1980). Whether a

6

person is in custody during the interrogation is determined by the physical and/or psychological restraints placed on the person and whether a reasonable person under the same circumstances as the defendant would understand that he had been deprived of his liberty in a significant way. *United States v. Griffin*, 922 F.2d 1343 1347 (8th Cir.1990). In *United States v. Martinez*, 462 F.3d 903, 909 (8th Cir. 2006), the court identified six non-exclusive factors to be considered: (1) whether the police told the suspect the questioning was voluntary; (2) whether the suspects movement was restrained during the questioning; (3) whether the suspect initiated the contact with the police or the police initiated the contact in order to ask questions; (4) whether the police used strong arm tactics or deception during questioning; (5) whether the atmosphere was police dominated; and (6) whether the suspect was arrested at the end of the questioning. Courts use a totality of circumstances test to determine the question of custody. i*d.* (citing *United States v. Lanier*, 838 F.2d 281, 285 (8th Cir. 1988) (*per curiam*), but the critical question is whether a reasonable person in the defendant's position would have felt free to end the interview. *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012).

On December 14, 2017, Ms. Candela had gone to the public library to return books. She went early in the morning and parked in front of the library. She left her mother's truck and walked up to deposit the books in the after-hours book drop. She returned to the truck and as she was

7

leaving the area for book drop-offs, she was cut off by the agents in an unmarked car. This frightened her. Officer Daneff got out of the car, and approached her, knocking on her window. He identified himself as a police officer and told her step out of the car. He escorted her to the car Officer McCormick was driving. He put her in the front passenger seat of the car and closed the door behind her. She said it felt like she was being arrested. A reasonable person would feel the same way and that she was not free to leave or resist.

Of the six factors used to analyze the custody determination, mentioned above, all six weigh against the police. She was never told the questioning was voluntary or that she didn't have to get in the car and was free to go. Indeed, they blocked her path, preventing her from leaving. The police initiated contact in order to question her; their contact was forceful and frightened her—they blocked her exit and moved her from her vehicle to the police vehicle. Her movements in the police vehicle were restrained. The door was closed behind her by Officer Daneff. The atmosphere was dominated by the police. She was never told that she was free to leave or that she was not under arrest. Once in the car, she was pressured to talk to them. They told her that they already knew a lot about what was going on and that she should come clean and work with them. The police frequently say this when in fact they don't know what's going on as a tactic to learn more and make the person being interrogated feel that its futile not to talk. Ms. Candela was not a

8

seasoned criminal. She had no criminal history, a DUI charge was her only criminal event and it was dismissed. She would have no way of knowing what the police knew, but the pressure she felt, as would a reasonable person in this situation, was real. In *Miranda*, the court noted the police tactics and the psychological pressure one can feel when under interrogation. *Miranda*, 384 U.S. at 443, 448 (modern practice is more psychologically than physically based). One of the most effective techniques is privacy, *id.* at 449, whether an interrogation room or the privacy of a car filled with police surrounding the accused, the key is to deprive the subject of every psychological advantage—take her to the police car rather than talk to her while she is in her car to make her feel uncomfortable and exposed.

Under a totality of the circumstances, Ms. Candela was in custody under interrogation on December 14, 2017. Her reaction was no different than that of a reasonable person in her shoes: frightened when cut off by an unknown car—there was no reason to cut her off, the drop-off area was not crowded; no other cars were there. It was early in the morning. There was no obvious reason to cut her off and block her departure. Daneff approached her, ordered her out of her truck and escorted her back to the police vehicle, closing the door behind her after she was told to get in, and then drove her truck to a different area. She, like most people in her circumstances, submitted to the police authority and did as she was told, reasonably not believing she had any alternative. At no

9

point during the encounter was Ms. Candela told she didn't have to comply with the officer's request or that she was free to go or could refuse to answer questions. The officers' approach, cutting her off from leaving, suggested that compliance was not voluntary, but rather, mandatory. Once in the car, they pressured her psychologically to answer questions, telling her that they already knew what was going on and what she had done and tried to convince her that it was in her best interest to cooperate and work with them. At no time during the initial encounter or any subsequent encounter was Ms. Candela advised her of her *Miranda* rights by the agents. No reasonable person under the circumstances would have thought she was free to cut the interrogation off and leave.

In *United States v. Franklin*, 326 F.Supp.3d 826 (2018), this court held that the confession of a defendant who was engaged in conversation by officers and not read his *Miranda* rights was in custody, handcuffed sitting by the parked police car and surrounded by officers. The officers should have known that their questions to him were likely to elicit incriminating responses, which they did. The court held that without the *Miranda* warnings, the confession was involuntary and not admissible. *Id.* at 829-30.

Suppression.

Ms. Candela was interrogated while in custody on December 14th without the benefit of having been provided the *Miranda* warnings as

10

required by law. Consequently all the statements made in that interrogation should be suppressed and declared inadmissible at trial. In the subsequent follow-up interviews of Ms. Candela on the 16th and 28th—by McCormick and others, which were also unwarned—are tainted. In *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963), the Supreme Court held that if the evidence was gained by exploiting the primary illegality, the evidence was tainted and unless the taint was purged, that evidence must also be suppressed as fruit of the poisonous tree. Here, the follow up interviews would have been impossible absent the illegal custodial interrogation on December 14th, unless Ms. Candela voluntarily agreed to cooperate, which could only have happened if she had been warned of her *Miranda* rights and agreed to waive those rights. Because the warnings were never given to her at all, the government cannot purge the taint of the illegal interview on the 14th, and all of her subsequent statements to the government must be suppressed.

Respectfully submitted,

/s/ Thomas H. Johnson
Thomas H. Johnson #13688
Petefish, Immel, Hird, Johnson,
 Leibold & Sloan, LLP
842 Louisiana
Lawrence, Kansas 66044
Phone: (785) 843-0450
Fax:    (785) 843-0407
tjohnson@petefishlaw.com
Attorneys for Ms. Candela

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of March 2020, I electronically filed the foregoing motion to suppress with the clerk using the CM/ECF system, which will notify all attorneys of record.

/s/ Thomas H. Johnson
Thomas H. Johnson
