IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 19-00031-07-CR-W-BCW |
| ) | |
| CRYSTAL CANDELA, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Crystal Candela's Motion to Suppress (Doc. #110). For the reasons set forth below, it is recommended that this motion be denied.

I. BACKGROUND

On January 25, 2019, the Grand Jury returned a two-count Indictment against defendants Miguel Cerros, Jose Louis Calderon-Zapata, Eddie Calderon-Zapata, Wilfredo Avalos-Pena, Adrian David Segura, Alfredo Garcia-Rodriguez, and Crystal Candela. On June 4, 2019, the Grand Jury returned a six-count Superseding Indictment against defendants Cerros, Jose Calderon-Zapata, Eddie Calderon-Zapata, Avalos-Pena,[1] Segura, Garcia-Rodriguez, and Candela. Defendant Candela is charged with conspiracy to distribute methamphetamine (Count One) and conspiracy to commit money laundering (Count Two).

An evidentiary hearing on defendant Candela's Motion to Suppress was held on September 17, 2020. Defendant Candela was represented by appointed counsel Thomas H. Johnson. The

---

[1] There is an outstanding arrest warrant for defendant Avalos-Pena.

Government was represented by Assistant United States Attorney Bruce A. Rhoades. The Government called Special Agent Trish McCormick of the Federal Bureau of Investigation ("FBI") and Detective Joseph Daneff[2] of the Kansas City, Missouri Police Department as witnesses. Defendant Crystal Candela testified on behalf of the defense.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On December 14, 2017, Special Agent Trish McCormick and Task Force Officer Joseph Daneff were in Denver, Colorado, for the purpose of talking to Crystal Candela with respect to a drug investigation in Kansas City, Missouri. (Tr. at 3-4.) Special Agent McCormick testified that the officers knew that Ms. Candela was involved in the drug conspiracy they were investigating based on their evidence. (Tr. at 23.)

2. The officers first saw Ms. Candela at her apartment complex at approximately 8:00 a.m. when she was getting into her vehicle with her son. (Tr. at 4-5, 106.) The officers followed Ms. Candela's vehicle to an elementary school where she dropped off her son. (Tr. at 5-6, 106.) The officers continued to follow Ms. Candela's vehicle to a public library. (Tr. at 6, 106.) The officers were driving a rental car, with no police markings or equipment. (Tr. at 3-4.)

3. Ms. Candela parked at the front of the library, got out of her vehicle, and walked to the book drop. (Tr. at 6, 106-07.) The officers parked behind Ms. Candela's vehicle. (Tr. at 6, 108.) Task Force Officer Daneff testified that he had no doubt that the officers were parked behind Ms. Candela's vehicle. (Tr. at 110.) Special Agent McCormick testified that the officers' vehicle was not blocking Ms. Candela's vehicle. (Tr. at 6-7.) There were other people at the front of the library. (Tr. at 7.)

4. As Ms. Candela was walking back to her vehicle from the book drop, the officers got out of their vehicle and contacted her.[3] (Tr. at 6, 107, 110.) The officers were

---

[2]Detective Daneff is also a Task Force Officer with the FBI. (Tr. at 3, 105.)

[3]Defendant Candela testified that she was back in her vehicle, ready to go, when the officers pulled in front of her vehicle, blocking her ability to leave. (Tr. at 58, 61-62.) On cross-examination, defendant Candela admitted that she could have backed up. (Tr. at 90.) Defendant Candela testified that the male officer knocked on her window, asked her to get out of her vehicle to answer

2

dressed in plain clothes with their badges hanging around their necks. (Tr. at 4, 107-08.) While the officers were armed, they did not exhibit any weapons. (Tr. at 7, 111.) The officers identified themselves as law enforcement. (Tr. at 6, 107.) Task Force Officer Daneff testified that he identified himself as a task force officer with the FBI. (Tr. at 110-11.) Special Agent McCormick testified that she told Ms. Candela that the officers were conducting a drug investigation and that they would like to speak with her about it inside their vehicle. (Tr. at 8-9.) Special Agent McCormick testified that she did not do anything to indicate that Ms. Candela was not free to leave or that she was required to talk to the officers, rather the officers told Ms. Candela that it was voluntary, that she was not under arrest, and that she was free to leave. (Tr. at 9.) Task Force Officer Daneff testified that Special Agent McCormick told Ms. Candela several times, both before and while in the officers' vehicle, that "you're not under arrest, you're not under indictment, we're here to talk to you and here's the reason why, and we believe you can provide information." (Tr. at 127.)

5. Special Agent McCormick testified that Ms. Candela agreed to get in the officers' vehicle. (Tr. at 8.) Special Agent McCormick testified that she told Ms. Candela that it was voluntary, that she did not have to talk to the officers, and that she was free to leave again inside the officers' vehicle.[4] (Tr. at 9.) Task Force Officer Daneff testified that Ms. Candela walked to the officers' vehicle without him guiding her or touching her. (Tr. at 113.) After Ms. Candela was inside the officers' vehicle, Task Force Officer Daneff asked her if he could move her car from the front of the library into the parking lot. (Tr. at 10, 115.) Ms. Candela said yes and provided Task Force Officer Daneff with the keys.[5] (Tr. at 10, 115.)

---

some questions, opened Candela's car door, shepherded Candela into the officers' vehicle, and closed the door behind her. (Tr. at 62-63.) On cross-examination, defendant Candela testified that while she did not know that the man knocking on her window was a police officer, she thought she had to do whatever he told her to do. (Tr. at 90-92.)

[4]Defendant Candela testified that the officers never told her that she was not under arrest, never told her that she did not have to talk to them, and never told her that she could leave at any time. (Tr. at 64.)

[5]Defendant Candela testified that she had left the keys in her vehicle with the motor running. (Tr. at 99-100.) Defendant Candela testified that Task Force Officer Daneff moved her vehicle immediately upon shepherding her to the officers' vehicle. (Tr. at 63.) Defendant Candela testified that she and Special Agent McCormick remained parked in front of the library. (Tr. at 63.) Defendant Candela testified that Special Agent McCormick proceeded to tell Candela that she knew Candela's name and what Candela was doing. (Tr. at 63.) Defendant Candela testified that Task Force Officer Daneff got in the backseat after he had moved Candela's vehicle. (Tr. at 64.) Defendant Candela testified that she felt that Task Force Officer Daneff was in the vehicle to make sure that she stayed in the vehicle to answer questions. (Tr. at 68.)

5. Special Agent McCormick parked the officers' vehicle next to Ms. Candela's vehicle in the parking lot. (Tr. at 10, 115.) Task Force Officer Daneff then got back in the vehicle with Special Agent McCormick and Ms. Candela and gave Ms. Candela her car keys.[6] (Tr. at 11, 116.) Special Agent McCormick testified that Ms. Candela was not handcuffed nor otherwise restrained and that the doors were not locked. (Tr. at 11.)

6. Ms. Candela's phone rang while she was in the officers' vehicle. (Tr. at 12.) It was Ms. Candela's live-in boyfriend calling. (Tr. at 12.) The officers told her to go ahead and answer the call if she wanted. (Tr. at 12.) Special Agent McCormick got the impression that Ms. Candela did not want to tell her boyfriend that she was with the officers.[7] (Tr. at 12.)

7. The officers told Ms. Candela that they were investigating a drug case in Kansas City. (Tr. at 13.) Special Agent McCormick testified that she did not show Ms. Candela any pictures.[8] (Tr. at 41.) The officers went into some specifics about some suppliers in California with whom they knew Ms. Candela had contact. (Tr. at 13.) "The investigators informed Crystal her gray Toyota Camry had been to 'Alfredo's' house and he was arrested for a large amount of methamphetamine. . . . The investigators informed Crystal that on November 11th, Alfredo had been sentenced to 8 years in prison . . . ."[9] (Def. Exh. 1; Tr. at 39-40.) Special Agent McCormick testified that during the conversation with Ms. Candela, the officers advised her on different occasions that this is voluntary, that she was not under arrest, and that she was free to leave at any time. (Tr. at 13.) Task Force Officer Daneff testified that both he and Special Agent McCormick told Ms. Candela that she was not under arrest. (Tr. at 116.)

---

[6]Defendant Candela testified that she was not given her keys back until the officers had finished talking with her. (Tr. at 64, 101.) Defendant Candela testified that the officers' vehicle remained parked in front of the library until the officers had finished talking with her. (Tr. at 68-69, 101-02.)

[7]Defendant Candela testified that Special Agent McCormick told her that she could not tell anyone, including her boyfriend, that she had talked to Special Agent McCormick. (Tr. at 98.)

[8]Defendant Candela testified on direct examination that Special Agent McCormick had a picture of Candela on her lap, but that she did not have pictures of any other people. (Tr. at 63-64.) On cross-examination, defendant Candela testified that Special Agent McCormick showed her a lot of pictures of different people. (Tr. at 86-87.)

[9]Defendant Candela testified that she felt scared and pressured to talk and answer the officers' questions so that she would not receive a sentence like Alfredo. (Tr. at 67.)

4

8. Special Agent McCormick testified that in her ten years as an FBI agent, she has approached other individuals, as she did Ms. Candela, in an attempt to develop a Confidential Human Source (CHS). (Tr. at 13-14.) Special Agent McCormick testified that her standard procedure is to tell the individuals that "it's voluntary, you're not under arrest, you don't have to talk to us, you can leave at any time." (Tr. at 15.)

9. While inside the officers' vehicle, Ms. Candela provided information to the officers about the drug conspiracy they were investigating. (Tr. at 15.) Special Agent McCormick testified that Ms. Candela stated that she wanted to cooperate and provide information. (Tr. at 15.) Special Agent McCormick testified that she made no promises to Ms. Candela about what would happen to her, she did not tell Ms. Candela whether she would or would not be indicted, nor did she tell Ms. Candela whether she would or would not be arrested.[10] (Tr. at 15, 43, 47, 49, 51, 53.) Special Agent McCormick testified that Ms. Candela did not ask about being indicted or being arrested. (Tr. at 16.) The conversation lasted approximately thirty minutes. (Tr. at 16.) At the conclusion of the conversation, Ms. Candela provided her phone number to the officers and advised what would be the best time to call her. (Tr. at 16.) Special Agent McCormick testified that the officers did not advise Ms. Candela of her *Miranda* rights because *Miranda* was not triggered as it was a voluntary interview during which Ms. Candela was free to leave.[11] (Tr. at 31.)

10. Neither Special Agent McCormick nor Task Force Officer Daneff saw Ms. Candela again after this initial meeting. (Tr. at 17.) Special Agent McCormick testified that she had a phone conversation with Ms. Candela on December 16, 2017, where they went through more details about information that needed to be clarified.[12]

---

[10]Defendant Candela testified that Special Agent McCormick told her that if she cooperated, she would get a lower sentence and that it would help her in her case. (Tr. at 66.) While the Source Opening Communication which was prepared by Special Agent McCormick on December 20, 2017, states "[t]he CHS was approached and given the opportunity to be a CHS in lieu of being charged in a drug conspiracy" (Def. Exh. 2 at 3), this form was never shown to Ms. Candela. (Tr. at 54.)

[11]Defendant Candela testified that if the officers had advised her of her rights, she would not have cooperated. (Tr. at 73.) Defendant Candela testified that at some point during the questioning, she asked the officers if she needed a lawyer. (Tr. at 65-66.) Defendant Candela testified that Special Agent McCormick said, well, you can get one, but then continued asking more questions. (Tr. at 66.) Special Agent McCormick testified that she does not remember defendant Candela asking if she needed a lawyer. (Tr. at 43.) Task Force Officer Daneff testified that he did not hear defendant Candela ask for a lawyer. (Tr. at 127-28.)

[12]Defendant Candela testified that Special Agent McCormick called her several times before she finally returned the call. (Tr. at 69.) Defendant Candela testified that she felt intimidated and

5

(Tr. at 22.) Special Agent McCormick testified that she also had contact with Ms. Candela over the phone about Denver agents needing to show her some photographs and then the Denver agents had in-person contact with Ms. Candela. (Tr. at 17, 21.)

11. Special Agent McCormick asked the Denver agents to show Ms. Candela some photographs of individuals in the case and to also read to her admonishments that are read to all CHSs. (Tr. at 18.) The Denver agents met with Ms. Candela in the parking lot of a Panda Express. (Tr. at 71-72, 80-81.) Ms. Candela suggested the location for the meeting. (Tr. at 103.) The Denver agents showed Ms. Candela the photographs and read her the admonishments on December 28, 2017.[13] (Tr. at 18.) Special Agent McCormick explained:

> We have four standard admonishments, and then we have additional admonishments that we read to our CHS, so they know where they stand with us, that it has to be truthful, it has to be voluntary, they're -- we're going to strive to protect their identity but we can't guarantee it, and that they have to follow our instructions.

(Tr. at 19.) Special Agent McCormick testified that the Denver agents read Ms. Candela the standard four admonishments. (Tr. at 19.) The admonishments which were read to Ms. Candela on December 28, 2017, are set out in a CHS Admonishments form (Def. Exh. 3). (Tr. at 54.) One of the additional admonishments read to Ms. Candela provided:

> The FBI on its own cannot promise or agree to any immunity from prosecution or other consideration by an FPO, a state or local prosecutor, or a court in exchange for the CHS's cooperation because the decision to confer any such benefit lies within the exclusive discretion of the prosecutor or court. However, the FBI will consider (but not necessarily act upon) advising the appropriate prosecutor of the nature and extent of the CHS's assistance to the FBI. . . .

(Def. Exh. 3 at 1; Tr. at 54.)

---

thought she had to do what Special Agent McCormick wanted her to do. (Tr. at 69.) Defendant Candela testified that she also returned the call "because of the lower sentence thing, I didn't want to get into trouble even worse than what I was there." (Tr. at 69-70.)

[13]Defendant Candela testified that she met with the Denver agents because she felt she had to do whatever the authorities told her to do. (Tr. at 72.) Defendant Candela testified that the Denver agents showed her photographs, but that they did not read her any admonishments. (Tr. at 72, 78-79, 81.)

12. Special Agent McCormick testified that she attempted to reach out to Ms. Candela two or three times after December 28, 2017, to follow up with her and continue her cooperation, but Special Agent McCormick did not hear back from Ms. Candela.[14] (Tr. at 21-23.) Ms. Candela never indicated to Special Agent McCormick that she no longer wanted to cooperate or have contact with her. (Tr. at 22.) Special Agent McCormick testified that she closed Ms. Candela's file in March of 2018 since she had not heard back from her. (Tr. at 22.)

### III. DISCUSSION

Defendant Candela seeks to suppress "her statements taken by the police in a custodial interrogation conducted in a police car on December 14, 2017, in Denver, Colorado, and subsequently in a follow-up telephone call on December 16, 2017, and a meeting on December 28, 2017." (Motion to Suppress at 1; Doc. #110.) Defendant Candela argues that officers obtained these statements "without advising her of her Miranda rights, knowing that their questioning was designed to elicit incriminating statements from her." (*Id.*)

"The basic rule of *Miranda* is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). *Miranda* warnings are necessary because "the inherently coercive nature of custodial interrogation blurs the line between voluntary and involuntary statements." *United States v. Diaz*, 736 F.3d 1143, 1148 (8th Cir. 2013) (citations omitted). *Miranda* is triggered when a suspect is (1) interrogated (2) while in custody. *Griffin*, 922 F.2d at 1347. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should

---

[14] Defendant Candela testified that she did not return Special Agent McCormick's calls because she was confused and afraid. (Tr. at 74.) Defendant Candela testified that it is difficult for her to understand a lot of things; she feels like she has a learning disability, although she has never been diagnosed with a learning disability. (Tr. at 74-75.)

7

know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted). There does not appear to be any dispute that defendant Candela was interrogated in this case. The issue before the Court is whether defendant Candela was in custody during the interrogation.

As set out in *United States v. Laurita*, 821 F.3d 1020 (8th Cir. 2016), courts must look at the totality of the circumstances to determine whether a person is in custody for purposes of *Miranda*:

> To determine whether a suspect was in custody, we ask "whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave or cause the agents to leave." *United States v. Vinton*, 631 F.3d 476, 481 (8th Cir. 2011). We have set forth six non-exclusive indicia of custody:
>
>> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; [and], (6) whether the suspect was placed under arrest at the termination of the questioning.
>
> *Griffin*, 922 F.2d at 1349.

*Laurita*, 821 F.3d at 1024. If, after considering the totality of the circumstances, the court finds the person being questioned was not in custody, *Miranda* warnings were not required. *See United States v. Mshihiri*, 816 F.3d 997, 1003-04 (8th Cir.), *cert. denied*, 137 S.Ct. 319 (2016); *United States v. Sanchez*, 676 F.3d 627, 632 (8th Cir. 2012); *United States v. Perrin*, 659 F.3d 718, 721-22 (8th Cir. 2011).

8

The Court has been presented with contrasting descriptions of the circumstances surrounding the contact between Special Agent McCormick, Task Force Officer Daneff, and defendant Candela. In the Motion to Suppress, defendant Candela provided the following description of her initial contact with Special Agent McCormick and Task Force Officer Daneff:

> On December 14, 2017, early in the morning, Ms. Candela, driving her mother's truck, stopped at the public library to drop off some books. She pulled into the drop-off area in front of the library, got out and took the books to the after-hours drop-off box and returned to her truck. As she was leaving, officers pulled up next to her in an unmarked car and cut off her exit, blocking her ability to leave. This frightened her. Officer Daneff got out of the car, approached her truck, knocked on the window and told her to get out of her vehicle and into the officers' car. He escorted her to the police car and put her in the front passenger seat (Officer McCormick was in the driver's seat) and closed the door behind her. He then got into Ms. Candela's truck and moved it from the front of the library to a longer-term parking space. He then returned to the police vehicle and got in the back seat behind Ms. Candela. Ms. Candela felt as if she were under arrest. She wasn't told that, but the officer's actions implied as much and that's what it felt like to her and would to any reasonable person. She felt, just as any other person would have, that she had no choice. Officer McCormick then began to question her and pressure her to talk, telling her she knew what was going on and that Crystal would be better off if she told them what she knew. The agents interrogated her about people in the drug trafficking organization and about the gray Toyota Camry registered in her name; she answered the officers' questions. Agent McCormick wanted Ms. Candela to work for them. At no time during the interrogation was she provided her *Miranda* warnings; nor was she told that she was free to leave and under no obligation to answer their questions. Ms. Candela never agreed to work for the police.

(Doc. #110 at 3-4.) While defendant Candela testified somewhat consistently with this description of the encounter at the suppression hearing, Special Agent McCormick and Task Force Officer Daneff described the encounter in a much different way.

According to Special Agent McCormick and Task Force Officer Daneff, they pulled in behind defendant Candela's vehicle at the front of the library. (Fact No. 3.) The officers' vehicle was not blocking defendant Candela's vehicle. (*Id.*) As Ms. Candela was walking back

9

to her vehicle from the book drop, the officers got out of their vehicle and contacted her, identifying themselves as law enforcement. (Fact No. 4.) The officers did not exhibit any weapons. (*Id.*) The officers told defendant Candela that they were conducting a drug investigation and that they would like to speak with her because they believed she could provide information. (*Id.*) The officers told defendant Candela that this was voluntary, that she was not under arrest, and that she was free to leave. (*Id.*) Special Agent McCormick testified that her standard procedure when attempting to develop a CHS is to tell the individuals that "it's voluntary, you're not under arrest, you don't have to talk to us, you can leave at any time." (Fact No. 8.) Defendant Candela agreed to get in the officers' vehicle. (Fact No. 5.) After Ms. Candela was inside the officers' vehicle, Task Force Officer Daneff asked her if he could move her car from the front of the library into the parking lot. (*Id.*) Defendant Candela said yes and provided Task Force Officer Daneff with the keys. (*Id.*) Special Agent McCormick parked the officers' vehicle next to defendant Candela's vehicle in the parking lot. (*Id.*) Task Force Officer Daneff then got back in the vehicle with Special Agent McCormick and defendant Candela and gave Candela her car keys. (*Id.*) Defendant Candela was not handcuffed nor otherwise restrained and the doors were not locked. (*Id.*) The officers told defendant Candela that they were investigating a drug case in Kansas City. (Fact No. 7.) They went into some specifics about some suppliers in California with whom they knew defendant Candela had contact. (*Id.*) The officers did not show defendant Candela any pictures. (*Id.*) During their conversation with defendant Candela, the officers advised Candela on different occasions that this is voluntary, that she was not under arrest, and that she was free to leave at any time. (*Id.*) When defendant Candela's phone rang, the officers told her to go ahead and answer the call if she wanted. (Fact

Case 4:19-cr-00031-BCW   Document 146   Filed 11/23/20   Page 10 of 13

No. 6.) While inside the officers' vehicle, defendant. Candela provided information to the officers about the drug conspiracy they were investigating. (Fact No. 9.) Defendant Candela stated that she wanted to cooperate and provide information. (*Id.*) The conversation lasted approximately thirty minutes. (*Id.*) At the conclusion of the conversation, defendant Candela provided her phone number to the officers and advised what would be the best time to call her. (*Id.*)

The Court finds the testimony of Special Agent McCormick and Task Force Officer Daneff to be more credible than that of defendant Candela. Defendant Candela repeatedly testified to facts which were at odds with the testimony of the two officers. Defendant Candela also appeared to contradict herself at times and some of what she said seemed unlikely. For instance, defendant Candela testified that she was in her vehicle, ready to go, when the officers pulled in front of her vehicle, blocking her ability to leave the library. (Fact No. 4, fn. 3.) However, on cross-examination, defendant Candela admitted that even under her facts, she could have backed up to leave. (*Id.*) Further, on cross-examination, defendant Candela claimed that she did not know that the man knocking on her window was a police officer, yet she exited her car, left the motor running, and got into another car at this man's direction because she thought she had to do whatever he told her to do. (Fact No. 4, fn. 3, and Fact No. 5, fn. 5.) The Court finds it unlikely that someone would leave a running vehicle unattended and get into another vehicle with strangers just because someone knocked on their window and told them to do it. There were other people at the front of the library. (Fact No. 3.) Defendant Candela could have sought help from these other people, if she were fearful. Finally, defendant Candela contradicted herself about what took place inside the officers' vehicle, stating on direct examination that Special Agent McCormick had

11

a picture of Candela on her lap, but that she did not have pictures of any other people, and then stating on cross-examination that Special Agent McCormick showed her a lot of pictures of different people. (Fact No. 7, fn. 8.) Based on the inconsistencies in defendant Candela's testimony and the contrary testimony from Special Agent McCormick and Task Force Officer Daneff, the Court does not find defendant Candela credible.

Based on the testimony of Special Agent McCormick and Task Force Officer Daneff, the Court finds that the officers approached defendant Candela in a public place and repeatedly advised her that the encounter was voluntary, that she was not under arrest, and that she was free to leave at any time. Defendant Candela voluntarily got into the officers' vehicle. Defendant Candela was not handcuffed or otherwise restrained and the doors were not locked. Defendant Candela was not prevented from answering her phone. Defendant Candela told the officers that she wanted to cooperate and provide information. The conversation lasted only thirty minutes. At the conclusion of the conversation, defendant Candela provided her phone number to the officers and advised what would be the best time to call her. Defendant Candela was not arrested at the conclusion of the meeting. Given the totality of the circumstances, the Court finds that a reasonable person would have felt at liberty to terminate the encounter and leave. Thus, the Court finds that defendant Candela was not in custody on December 14, 2017, and that *Miranda* warnings were not required.

Likewise, no *Miranda* warnings were required for the follow-up telephone call defendant Candela made to Special Agent McCormick on December 16, 2017, nor the meeting on December 28, 2017, where defendant Candela arranged to meet with agents at a location chosen by Candela, as defendant Candela was not in custody (and does not appear to argue that she was in custody) on

either of these occasions. Defendant Candela does argue, however, that because the statements she made on December 16 and December 28, 2017, were only made possible because of the illegal custodial interrogation on December 14, 2017, these additional statements should be suppressed as fruit of the poisonous tree. (Motion to Suppress at 11; Doc. #110.) Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of evidence obtained directly or indirectly through the exploitation of police illegality. *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). As set forth above, the Court finds that Special Agent McCormick and Task Force Officer Daneff were not required to give *Miranda* warnings to defendant Candela on December 14, 2017, as she was not in custody. As there was no police illegality, defendant Candela's fruit of the poisonous tree argument must fail.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Candela's Motion to Suppress (Doc. #110).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

*/s/ Lajuana M. Counts*
Lajuana M. Counts
United States Magistrate Judge